### UNITED STATES v. AH SOU.

(Circuit Court of Appeals, Ninth Circuit. May 1, 1905.)

No. 1,110.

1. CHINESE EXCLUSION—ILLEGAL ENTRY OF WOMAN—EFFECT OF MARRIAGE TO CHINESE LABORER.

Where a Chinese slave girl was brought to the United States, and her entry secured by fraud in violation of the exclusion laws, her subsequent marriage in this country to a Chinese inhabitant registered as a Chinese laborer, and not entitled to have a wife in this country, is not a defense to proceedings for her deportation; and especially where the marriage was at her solicitation, for her protection, and was not followed by cohabitation, nor apparently regarded by the parties as more than a formality.

[Ed. Note.—For cases in point, see vol. 2, Cent. Dig. Aliens, § 80.]

2. Same—Deportation of Slave Girl.

The fact that the deportation of a Chinese slave girl illegally brought into this country for purposes of prostitution by her master, from whom she subsequently escaped, would result in remanding her to slavery and degradation, affords no ground upon which the courts can refuse to enforce the statute.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

For opinion below, see 132 Fed. 878.

Jesse A. Frye, Edward E. Cushman, and Alfred E. Gardner, for appellant.

John P. Hartman, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge.  On January 1, 1904, the appellee, a Chinese girl, was apprehended for being unlawfully in the United States, and, upon examination before a United States Commissioner, was adjudged to be unlawfully in the United States, and ordered to be deported to China, whence she came.  An appeal was taken from that order and judgment to the judge of the District Court for the District of Washington, and the order and writ of deportation were accordingly stayed.  Upon testimony taken on the appeal, the order of the commissioner was reversed, and it was ordered that the appellee be permitted to remain in the United States. From that judgment this appeal is taken.  The testimony shows that the appellee was brought to the United States for purposes of prostitution, but that she entered the United States ostensibly as the minor daughter of Moy Sam, a Chinese merchant residing at Tacoma, Wash.  She was not the daughter of Moy Sam, but was the slave of a Chinaman by the name of Ah Bun, who had purchased her in China, and who had schooled her to say that she was the daughter of Moy Sam, and the sister of Yee Gun, who was the son of Moy Sam.  Moy Sam connived with Ah Bun in imposing upon the immigration officers at Port Townsend, and through false representations the appellee secured an unlawful entrance into the United States.  At the time of securing this unlawful entrance she did not belong to the privileged class, nor was she a person allowed to enter and remain in the United States under the Chinese exclusion laws.  Thereafter Ah Bun, her master, compelled her to enter upon a life of prostitution.  She escaped from him, and took refuge in the Chinese Women's Home at the city of Portland, where she lived for a time.  She was there married to a Chinese inhabitant of this country, who was registered as a Chinese laborer.  The marriage ceremony was performed in compliance with the laws of Oregon.  The district judge, in his opinion, said of the marriage:

"The marriage has not been consummated by cohabitation, and it appears to be questionable whether the parties themselves regarded it as bona fide, or only a mere pretense, creating no binding obligation.  The woman was not contented at the home, and she solicited the man to marry her and become her protector.  He was reluctant, and by his testimony he appears to be uncertain whether he is in fact the woman's husband."

In thus regarding the marriage, and in holding that its effect was not to legalize the presence of the appellee in the United States, we think the court was undoubtedly correct. The man to whom she was married was a Chinese laborer, but just prior to the marriage he had made an application for a certificate of departure from the United States. He, being one of the prohibited class, was not privileged to have his wife in the United States, even if she could, under the circumstances, have lawfully contracted a marriage here. The trial court found that the appellee should be deported to China, whence she came, except for one thing; and that was that, in his opinion, her deportation would in fact be remanding her to a life of perpetual slavery and degradation.

The appellee has moved to dismiss the appeal on the ground that the sole question involved is the application of the thirteenth amendment to the Constitution of the United States, and that therefore the appellate jurisdiction of the Supreme Court is exclusive. We do not see that the decision of the appeal involves the construction or application of the thirteenth amendment. There is no reference to a constitutional question in any of the pleadings in the case. It is true that the thirteenth amendment was adverted to in the opinion of the trial court, but we do not understand that it was made the ground of the decision. The true ground of the decision, from the language of the opinion, would appear to have been that compliance with the statute would be a barbarous proceeding, equivalent to remanding the appellee to perpetual slavery and degradation. The court said:

"If sent back to her own country, where she was by her own kindred sold to a cruel master, she must abandon hope, and it is shocking to contemplate that the laws of our country require the court to use its process to accomplish such an unholy purpose."

The court, arguendo, proceeded to observe that it was proper to consider that by the thirteenth amendment it is ordained that neither slavery nor involuntary servitude, except as a punishment for crime, whereby the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction, and said:

"This article is a part of the supreme law of this land, whereby all branches of the government must be controlled," and that it was "a mandate from the highest authority, requiring the exercise of all the force necessary for the protection of the liberty of any and every individual whose right to liberty has not been forfeited by conviction of crime."

The court said in conclusion:

"The effort which the appellant has made to escape from thraldom and to rise from her condition of degradation entitles her to humane consideration, and, because I can see no other way in which to emancipate her from actual slavery, I direct that an order be entered vacating the order for her deportation."

In so ruling the court did not, as we understand it, hold that the thirteenth amendment, prohibiting slavery within the United States

or in any place subject to their jurisdiction, by its terms prohibited the deportation of the appellee; nor is it contended on this appeal that by virtue of an order of deportation her condition as a slave would be recognized, or that she would be sent into slavery at any place within the United States or within its jurisdiction. The case is one which, from its nature, enlists the sympathy of the court, and we regret that the law is so written that it does not permit us, as we view it, to yield to the humane considerations which actuated the court below.

We see no escape from the conclusion that the judgment of the trial court must be reversed, and the appellee remanded to the country whence she came. It is so ordered.